Good morning, and may it please the Court, James Dickey on behalf of the appellants here. As the unanimous Supreme Court said in Mattel v. Tam, if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored ideas—viewpoints, excuse me. That is what happened here. For months, the Lakeville Public Schools fought against local activists trying to have Black Lives Matter posters in school classrooms and hallways. And for months, the district said it couldn't happen because their policy forbid it. These local activists bullied the school board members themselves at public meetings, comparing them to Nazis and telling them that their refusal was akin to telling your black and brown students that their lives do not matter. At the same time, they called the Cajunes—these activists called the Cajunes racist for merely supporting a policy of neutrality on these hot-button political issues. By allowing teachers and employees—not the district itself, but teachers and employees—to post Black Lives Matter posters and expressly rejecting other posters on the same content and political issues, such as All Lives Matter or Blue Lives Matter, the district did exactly what the Supreme Court said was impermissible in the Rosenberger case and in Lamb's Chapel. It discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about something, except for dealing with the subject from a, in the Lamb's Chapel case, a religious standpoint. The poster series was designed to facilitate the private views of some members of the community. And control over whether a poster is posted is up to private individuals.  It's up to employees. Those teachers and employees are expressing their private viewpoints by making that decision to post the poster. But, of course, only if they agree with the private activists who initially proposed these posters from the start. The government's speech doctrine is not a catch-all for the government to support some private expression and squelch other private expression, and so this Court should reverse. And before I go any further, I want to make sure I answer any questions the Court has at the outset. Well, Counsel, when the plaintiffs proposed some alternative messages, what were the reasons that the school district gave for rejecting those messages, and were those reasons viewpoint-based? They were viewpoint-based, Your Honor, explicitly so. Paragraph 50 of our amended complaint gets into detail as to exactly what the school district said in response. And one of the, so one of the things that they said was that, quote, and this is paragraph 50D from the amended complaint, the All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter. And that those messages, quote, effectively discount the struggle the black students have faced in our school buildings and that black individuals face in our society as a whole. So the idea is, in fact, that the viewpoint that the Cajuns, who are here with me today, expressed was in opposition to the message that the school district was going to allow from these private activists and from teachers and employees in the school's hallways and classrooms. Given, and so one of the questions the Court might have is, you know, what about the history? There's three factors in the government speech test that we're looking at here from the Shurtleff case, which I think the Shurtleff case has to be the lodestar for the Court's analysis. So the first question is, what about history? Is there a history here that favors one side or the other? The answer is, in this case, the history actually favors the appellants. The Shurtleff Court said, first review the history of, you know, the government, governments in general flying flags and the messages that they convey. But the Court did not stop there. The Court went beyond that and said, what about Boston? Not just governments flying flags in general. What about Boston? And this Court in the Gerlich versus the Gerlich case from a few years back. You can see the general history favors the school district, right? Well, I'm not aware of any. Posters have been, at least they were when I was a kid, they were everywhere, right? Right. I mean, DARE posters were up in the 80s and the classrooms in the 90s and understandably that the school district, school districts across the country have certainly had some messaging in their hallways and people can all remember that. That's a general history point. But more important is that what Lakeville did prior to allowing these particular posters was to say none of that is going to happen here. And that's policy 535. It specifically, explicitly forbids political messages from being made in the hallways and classrooms of this, this school district. And it specifically rejected the BLM poster idea, right? Yes, for months from, I believe, September of 2020 all the way up until March of 2021, the superintendent, then superintendent Baumann actually said openly, this is a violation of this policy, so we can't do it. So it was explicitly rejected. So as it relates to on the history point in this case, because this, based on this school district's opposition to political messaging, which it still has as its policy, except for this one instance, that it's breaking its own policy. There is a history that favors the appellants. The second factor on the government speech is the public's perception of who is the speaker. And I think that in this case... Let me ask you a hypothetical here. Let's say that the superintendent initially said, take activists and teachers out of it, initially said, well, I don't think this is political and I'm going to allow it. Would it be a different case? I don't think so, because I think the question of whether it is political is not just the superintendent's sole discretion to decide. I think that if you look at in our complaint, we cited from, for example, the attorney general of Indiana, who make very clear, at least in the state of Indiana, of course, it's not the case in Minnesota specifically, but in his opinion, the Black Lives Matter movement is quite a political movement. I think any of us who are around in 2020 and saw what happened in the summer of 2020 would understand that the phrase Black Lives Matter is expressly associated with a political viewpoint and a movement. And that's exactly what we have alleged in the complaint. So I don't think it's a different case. I think it doesn't matter. And I'd also note that... So because viewpoint discrimination is based on particular viewpoints, they don't have to be political viewpoints. I just quoted the Lamb's Chapel case from the U.S. Supreme Court, which is quoted in the Rosenberger case. And in that case, there was a religious viewpoint that was being excluded. And on the other side, you had the school saying, well, we're going to include all different viewpoints except for that one. So it doesn't have to be political. The reason why politics matters in this case is because the express language of policy 535 is excluding political speech. Counsel, it may not change the historical analysis here under the short-lived test, but would you agree that there is a difference between what the First Amendment allows and what school policy allows? I'm not sure. The school might have a policy that's more restrictive than what would be allowed. Well, I think, and this gets to a really good point, which is that teachers and employees have their own First Amendment rights when they go into a school district. So, but a school district is still paying for their speech when it has to do with curriculum, when it has to do with teaching kids, legitimate pedagogical reasons. If, you know, school districts can have policy like policy 535, arguably, under the Constitution. And so they can restrict speech in ways that would not be allowable in other contexts. Is that getting at what you're asking? Well, I'm just saying that perhaps some government speech would not be allowed under school policy. There may be a distinction. Well, I'm not sure in the abstract. I don't know. I don't know how exactly to answer your question, Your Honor. But I think that, generally speaking, oh, I think so. Maybe the policy, instead of saying no political posters, said no posters, period. Right, right. So maybe an outright ban, which may or may not be constitutional itself. And I think that depends in large part on the speech of individual teachers and employees themselves, which is subject to a different analysis under Garcetti and Pickering. Not an issue here. But I think it does go, it does strengthen our position when you consider that teachers do have their own personal free speech rights, even when they're working in schools. Because, in fact, what the district doing here is allowing them to express private viewpoints as long as they're within a certain subset of approved viewpoints. On the question of the public's perception, though, again, looking at paragraphs 27 through 40 of our meta-complaint, you can see a summary, of course, we cite to the record as well, the public record which is out there, a summary of what happened. The opposition to these posters, followed by the decision to allow people to post these posters. So you have a history that demonstrates that the public is going to look at this and say, OK, the school district is now allowing teachers and employees to express their private viewpoints in school as long as they're within this range of favored viewpoints. So I think that the public perception is strongly in our favor. And I think that... Well, the statement you just made, doesn't that kind of blend the history into public perception? I think it does. And why shouldn't they be distinct factors? Well, I think they could be considered. We're here, regardless of what the history is, someone walks in the school and they see these posters, they see that they're professionally made, they see the logo of the school on the posters themselves. Why shouldn't we limit the public perception factor to, you know, the kind of the hypothetical reasonable observer that happens into the school? Well, I think the... Why don't we go back into the history when we're talking about that? Well, I think the Shurtleff case gives some guidance on this exact question, Your Honor. And I think that what the court said there was, you know, a reasonable third party observer could walk into, you know, what's going on. They're raising the flag in the Boston Square. And it didn't really cut either way in that case, because you're not sure if they're raising it on the behest of the city or if they're raising it on their own personal behest. I do think that... I don't think that they have to be... Because the Shurtleff analysis is, as the court said, very much a holistic analysis. I don't think they have to be strictly separated out. But I think even assuming that they could be, I don't think that that cuts against our position. Because a person would see that this is this teacher's classroom. This is in this administrator's location. So they could look at that and say, well, it's not... It's here, but it's not somewhere else if they're making a tour of the school, for example. And I see that I'm into my rebuttal time, but I just want to make one other last point, which is on point. The third issue, the extent to which the government controlled and shaped the messages. And I think, again, looking back at our allegations and our complaint, paragraphs 27 through 40, the school district's opposition to this series and then eventually caving and allowing it. And the fact that they said openly, and if you look at pages 5 and 16 of our reply brief, that this was designed to, quote, meet the requests of several of our staff members looking to put up posters affirming our students and our classrooms. You have Superintendent Baumann himself saying, it's really about what the classrooms and the teachers want to do. The Lakeville School District didn't have a lot of input into what these posters looked like or said. Really, it was just exactly what the government said in Mattel was not allowable, a rubber stamp by the government. And so we asked... I'm going to reserve the rest of my time for rebuttal unless there's any questions. And I ask the court to reverse. Very well, thank you. Thank you. Good morning, your honors. May it please the court, counsel. My name is Zach Cronin. I am the attorney for the appellees in this matter. We are here this morning on the appeal of Judge Blackwell's order dismissing, or affirming the district's motion to dismiss. I think it's helpful with all these questions that the court has been asking to take a step back and look at the context for when this program was developed. So in the wake of George Floyd's murder in 2020, and ongoing race and equity discussions across the country, the Lakeville Area School District decided it wanted to communicate a message of support for its black students, staff, and community members. The district determined that this was important to support students and create a respectful and welcoming educational environment. At a public board meeting, the board chair stated on behalf of the school board that through this poster series and stating Black Lives Matter, we are addressing the need to improve students' academic achievement. In order to communicate this message- Well, wait a minute. It did so though after rejecting, for I think a fairly significant period of time, this request, right? I don't think the school board ever rejected this request. The superintendent who's delegated with the ability to make recommendations regarding school board policy was responding to staff members' request to bring in sort of the kind of traditional, you know, the Black Lives Matter, black and white posters that you see. The school board never took any action to reject that. All right, but the superintendent did. Correct, and the superintendent ultimately, again, doesn't have- You're playing semantic games with me now. Well, I'd push back on that- What's the difference between a superintendent doing it and a school board doing it? Well, under School Board Policy 302, the superintendent doesn't have the authority to make that final determination. I think that process, frankly, started this discussion. There was a months-long equity discussion. There was school board meetings. There was trainings, and that culminated in this decision to make the poster series, which the school board specifically vetted and approved. Well, let me ask this. Who came up with the policy that the superintendent thought he was enforcing? The superintendent was interpreting the policy as he saw it. The policy of the board or of- Yeah, he was interpreting School Board Policy. So again, ultimately, under 123B02, the school board is tasked with governing, managing, and controlling the school district. So again, the superintendent made that determination, his recommendation. It started this process, and then later that same school year, the school board adopted this poster series. So that's sort of the timeline of this event, is there was a lot of discussion. The district doesn't dispute that there was meetings. There was community feedback, both for and against this, and the district school board ultimately made that determination to create the poster series. Counsel, I think this is a very challenging case, and I see some arguments on both sides, but we do have a little bit of guidance from the Supreme Court, and I want to ask you about some things that the Supreme Court has said. They said, we must exercise great caution before extending our government speech precedents. And they said that was because it is a doctrine that is susceptible to dangerous misuse. So my question is, are there any cases where the Supreme Court has upheld an ideological or political message as government speech? The Supreme Court, I do not believe, has addressed that, but there's been, you know, taking sort of Appellant's argument that this is political, which the district doesn't agree with. There's numerous federal courts now in recent years that have specifically addressed Black Lives Matter and found that it could be government speech. There was Pankoski, de Blasio, there's a number of cases with murals on the street. But no, the Supreme Court hasn't done that. And would we be extending the government speech doctrine into an ideological area? No, because there's no... In some of them, the court talked about there are restrictions on government speech. It's not a blank check. In some of them, they talked about you have to be mindful of the Establishment Clause. So you can't use government speech to mask that. You know, the example I think of is you can't use government speech to sort of get around copyright or trademark. We couldn't develop our own Nike knockoffs and then go sell them on the corner. There's restrictions on government speech. But there's nothing that says you can't talk about ideological things. The reality is governments are political bodies. They're elected officials. The fact that they speak on political issues is frankly reasonable. So where is the line? Could the school put up a poster that said make America great again? Or we stand with the free Palestine movement? Yeah, and I thought about that line a lot. And I think the reality is under Minnesota law, the government's expenditures have to have a public use or purpose. Yeah, I'm talking about the First Amendment, not other laws. Well, under the First Amendment, then there isn't a restriction on that. There's not a defined case law that says you can only go this far on political ideological issues. The constraints are constitutional or statutory in Minnesota with, again, the public use and purpose for school districts. And here that's been satisfied because the district school board chair specifically said that they believed stating that Black Lives Matter meant black students felt welcomed and it increased the educational environment of the school. Right, so I guess my next question is under Shurtleff, the Supreme Court said we have a holistic analysis. So in that light, when we're looking at the history prong of the Shurtleff test, wouldn't it be appropriate for us to look at not just the form of speech, such as posters, but also the category of speech, such as ideological or political? Is there any history of the school engaging in ideological communication through this type of medium? Frankly, I think the amended complaint specifically supports that. There are eight posters in this inclusive poster series, supporting diversity, these sort of things. They're only challenging two of them. The other six, they're not disputing, they're not asking them to be taken down. So the fact that there is eight posters here, only two are challenged, I think that does show that districts do speak on these issues and it's recognized that Lakeville specifically has spoken on this issue. You know, I think drawing that line... What is the history other than this series? Is there a history at all in the record? No, there's not history beyond this poster series, but in the de Blasio case, they talked about, you know, through the government speech doctrine, you have to be able to speak to new issues and at new times. So while history is a factor, there's multiple court cases where they haven't found the history prong and still issued a finding that it was government speech. Meck v. Palm Beach School District, which involved banners on fences, they said there was no clear history that the district had done that, but they found government speech. In de Blasio, there was Black Lives Matter murals on the streets. Again, there was no clear history that they'd done that, but ultimately they found through the other prongs, the control and the likely perception of the public that government speech still applied. And I just want to address one thing with the kind of rubber stamping. I think you were quoting from Mattal at the beginning of that question. So to me, Mattal is a very factually distinct case from this case. And I think the reality is Mattal, to me, makes sense. In that case, the Patent and Trademark Office was trying to say, everything we trademark is government speech. And that would be just incredible breath. Everything that comes to their office, they're required to approve it unless there's some limited exceptions. And the Supreme Court there noted that if that was the case, the Patent and Trade Office would be taking completely contradictory views on things. They'd be endorsing Nike and Adidas at the same time. They're just, it wouldn't make sense. Here, that's not what occurred. The district had this, again, months-long discussion about equity, created the poster series, and then its school board chair specifically stood by that poster series and say, we stand behind it and we support Black Lives Matter. So here, I think, I want to get back to the government. Well, before you do, I want to ask another question about the history, this history prong. And I think we, at least for me, I would tend to think that there is a great history in the public school business of posters. We've had all kinds, we can all remember posters. Promoting various things, a lot of them kind of public health kinds of things within the school. And you said that in this case, there's no history of ideological posters in any one direction or another. So in the history of this particular series of posters, it is the fact that the moving force or the idea for that came from a particular ideological viewpoint. Isn't that a significant factor that might push the history prong over to the appellants? I would say no here. I think it would be sort of, it would be difficult to say that because the district was responding to concerns from the electorate or constituents and then later develops government speech, that somewhat developed it through that process cuts against it. It would really undermine the government speech doctrine. The district here was listening to its constituents, both for and against, and decided it wanted to adopt it. So the fact that there wasn't this specific type of poster before, I don't think cuts against it. And I think, like I mentioned, there's multiple court cases where they specifically found this element hasn't been satisfied, but based on Shurtleff's holistic inquiry, you can still make a government speech finding here. And I think that's where the other two prongs also strongly support the district. Specifically, whether the member of the public would reasonably perceive this to be speaking on behalf of the district. Again, this entire concept, there's a month-long discussion. The posters themselves state that at Lakeville Area Schools, we believe Black Lives Matter. The school board chair, again, made a statement on that, supporting that as well. And these are only displayed on the internal walls of a school building. There's multiple court cases where they've said that, in Downs v. LA School District is one, where the walls of a school building serve as an artistic vehicle for the school board policy. There's one aspect of that factor to the point that you're making that I think kind of goes both directions. And I'd like to have you address that. And that is, this particular poster didn't just say Black Lives Matter. It says, and we stand with the social justice movement for which it stands, something like that. On the one hand, Black Lives Matter could be perceived by the public as support for students. But the second half of that statement is purely ideological. It seems to me that it kind of cuts the other way, that a person viewing that poster would think, well, that's a political statement. That must not be the school's speech. Well, and I would say to that point, they're not endorsing a political party. They're saying we stand behind this movement of bringing social justice. So the social justice movement is, I looked it up, it's a political or philosophical theory. Yeah, so I think, to me, that's, again, different than a political party or position. It's a movement that values the lives of black people. And so I think the fact that the government here, the school board, makes that statement, to me, there's no prevention on making that. So under your theory, they could put up a Make America Great Again banner, and the public would perceive that as government speech. No, again, well, I think there's parameters where I don't think that could be done. Because I don't think there'd be any public use or purpose behind that. Under state law, we have to have a public use and purpose. So if we're knowingly violating state law, the school board would be violating its duty. So I do think there's parameters. Ultimately, I get this as, these are sort of interesting questions and unique questions. But I think here, when, again, you look at the context of, to find that this is some other entity's speech, you'd have to ignore months of school board meetings. You'd have to ignore what's on the posters themselves. You'd have to ignore what the school board chair specifically said at a public school board meeting. You'd have to ignore the fact that these are all on the walls of a school district building. They're not on a fence. They're not in a public park. These are within the interior walls of a school board or a school building. Let me ask this. We're here on a 12b-6, right? Yep. So we have to take the pleadings for what they are. And the pleadings essentially say that the superintendent rejected it. And at the behest of activists and certain teachers, it was later allowed. And I think it was pled that teachers had the discretion to use them or not use them. We have to take all those facts as true at this point. Correct. So taking all those is true. I'm tending to doubt that they pled. Maybe they did. That there were months and months of school board meetings where both sides were heard. And they actually did. So I don't have the exact paragraph, but they cite these ongoing race and equity discussions. They say that the school's doing CRT. The context to me, there's sort of two bites at the apple. They say, hey, this poster series came out of nowhere and the district just rubber stamped it. But then they also say, hey, actually there's this months-long discussion about equity. They allege that a student had to leave the district because she felt she was being  The reality is this was a months-long discussion. The complaint references that. There's nothing in the complaint that overrides the fact that the school board was the body that made this decision. The school board was not required to approve these posters. It had every legal authority to say no. It chose to do so. The school board chair stood behind that. The posters themselves made a statement. So to me, the amended complaint, even at a Rule 12 stage, would support a motion to dismiss on that issue. And I know I'm kind of getting near the end here. I just want to wrap this up and say, whether the district's decision to create the poster series was the most efficient or the most effective way to achieve that goal of making black students and parents and family members feel welcomed, whether that was the most efficient way to do that, that's ultimately not the issue here. Whether reasonable minds could differ on if this was the best way to do it or if they believe or support the statement of Black Lives Matter, again, that's not the issue. The issue here is whether this is government speech. For the reasons we've outlined in our brief, the district believes that all three elements of the short-lift test have been satisfied. And, Judge, I just want to point, respond to one question you raised to Appellant's attorney regarding whether the policy could serve as a, if we're making arguments under policy, if we're making a First Amendment argument. To me, that's an important distinction because to the extent that they allege that we've violated Board Policy 535, that doesn't support a federal cause of action. That's a voluntary school board policy. The example I had was, if the school board said, we're not going to communicate with parents during the month of July because we want to give them a break, they send a communication. You know, obviously, that's a violation of the school board policy, but it doesn't support a federal cause of action. The same is true here. You know, applying the short-lift and the Walker analysis to this case shows that this is government speech. Well, thank you. Mr. Dickey, your rebuttal. Thank you again, Your Honors. I want to first go to a couple of different items that were discussed in terms of the superintendent's authority. First of all, paragraph 31 of the amended complaint identifies what he said at the October 6, 2020 meeting, which is, Black Lives Matter posters are not permitted. That's what we quote in the complaint. His authority derives from state law. There's a state statute on the superintendent's authority, but policy 302, as I believe my friend on the other side indicated, also cited in the complaint, paragraph 75, he has charge of the administration of the schools under the direction of the Board of Education. So there, the board does have authority over the superintendent. But policy 209 for the district, it's at reply brief, page five, footnote 16, notes that the school board works through the superintendent and not around the superintendent. So I think that in terms of what the superintendent says, it may not be binding on the school district in terms of what the board eventually does, but it does have a strong indication of what the policy of the school board is going to be. And he's also in charge of then implementing, allowing those posters into the classroom, which is why he's a official capacity defendant here as well. I do want to give the court some comfort about the flip side of the policy discussion about where's the line going to be drawn. I think the answer, when you have viewpoint discrimination under the First Amendment, the line is drawn at strict scrutiny. So it's not as though the courtroom, courthouses are going to be flung open to everyone complaining about what a school district does when the school district is, has a compelling state interest for doing something and there's no narrower way that they can achieve that interest. And that's what we're saying here is that in this case, there is no compelling state interest. There is no narrower way they could go about this because they have no compelling interest in saying no to one idea and saying yes to another idea on the same exact issue on the same matter of public concern. And on that note, if the court doesn't have any other questions, I would just note that this is, again, a limited public forum. They allowed for posters to be posted by teachers, which is consistent with what they would normally do when creating a limited or designated public forum. Those posters were then chosen, again, by the teachers themselves, who decide, they decide who's going to put what up. And with that, if there are no further questions. Question, just to confirm, does the complaint allege that Black Lives Matter is well known to be a neo-Marxist separatist slogan? Yes. Is that contained? And some other allegations about what that slogan or label is perceived as? Your Honor, yes. In paragraphs 41 through paragraph 48 of the complaint, we explain why it is a political statement which would be perceived by the public as a political statement. And with that, I ask, again, the Court to reverse. Thank you.